## JAMES HERRINGTON

### v.

### ELI PECK ET AL.

1. WATER-COURSES—RIGHT OF OWNER OF SUPERIOR ESTATE.—The owner of the superior estate has an easement attached to the inferior estate, giving him the right to have all the water that naturally falls or flows on his land, carried off over and upon the land of the lower estate, just as it did in a state of natur~

Herrington v. Peck.

2.  NATURAL FLOW OF WATER MAY NOT BE CHANGED.—But neither party has a right in respect to water or drainage, to so use or improve or change his land from a state of nature as to materially injure the other.

3.  DRAINAGE—INJURY TO SERVIENT ESTATE—REMEDY.—The draining of his lands, by the owner of the superior estate, in such a manner as to injure the owner of the servient estate, when not done in the interest of good husbandry, is an injury for which he may have a remedy by action.

4.  JURISDICTION IN EQUITY TO RESTRAIN UNLAWFUL DRAINAGE.—A court of equity has jurisdiction of an action by the owner of the servient estate, to prevent an unlawful drainage of the superior estate whereby he is injured.

APPEAL from the Circuit Court of Kane county; the Hon. C. W. UPTON, Judge, presiding.    Opinion filed May 31, 1882.

Mr. B. C. COOK, for appellant; that the owner of a dominant heritage can not cut artificial ditches to drain natural ponds of water from his own land onto the land of his neighbor below him to his damage, cited Hicks v. Silliman, 93 Ill. 255; Templeton v. Voshloe, Sup. Ct. Ind., March, 1881; Smith v. Kenrich, 7 C. B. 515; Dickenson v. City of Worcester, 7 Allen, 19; Butler v. Peck, 16 Ohio St. 334; Martin v. Riddle, 26 Pa. St. 415; Kauffman v. Quessner, 26 Pa. St. 407; Martin v. Jett, 12 La. 686; Miller v. Lauback, 47 Pa. St. 154; Livington v. McDonald, 21 Iowa, 160; Adams v. Walker, 34 Conn. 6; Pettigrew v. Evansville, 25 Wis. 223; Taylor v. Fickas, 64 Ind. 201; Schlecker v. Phillippi, 67 Ind. 201; Hoyt v. City of Hudson, 27 Wis. 656; Waffle v. N. Y. C. R. R. Co. 58 Barb. 413; Cooley on Torts, 577; Washburn on Easements, § 209; Wood on Nuisance, 404; Angell on Water-courses, § 108.

Mr. CHARLES WHEATON and Messrs. NICHOLS & CLAPSADDLE, for appellees; that for agricultural or mining purposes, the superior owner may improve his lands by throwing increased water through the natural channel, cited Martin v. Riddle, 26 Pa. St. 415; Kauffman v. Griesener, 26 Pa. St. 407; Martin v. Jett, 12 La. 504.

The owner of land may fill up wet or marshy places to his own advantage, even though his neighbor's land is incommoded

thereby: Goodale v. Tuttle, 29 N. Y. 459; Miller v. Lauback, 47 Pa. St. 154; Gormley v. Sanford, 52 Ill. 158; Washburn on Easements, 292; Broadbent v. Ramsbotham, 11 Exch. 602; Rawston v. Taylor, 11 Exch. 369; Delaturessage v. Judici, 11 La. An. 587; Herbert v. Hudson, 13 La. 54; Dallmore v. Davis, 14 La. 161; Angell on Water-courses, 122; Buffun v. Hains, 5 R. I. 243; Hicks v. Silliman, 93 Ill. 256.

Where there is an adequate remedy at law equity will not interfere: Long v. Barker, 85 Ill. 431; Hacker v. Barton, 84 Ill. 313; Clinton v. Schuster, 82 Ill. 137; Imperial Fire Ins. Co. v. Gurney, 81 Ill. 230; Arbuckle v. Ill. Cent. R. R. Co. 81 Ill. 424; Strubher v. Belsey, 78 Ill. 307; Stewart v. Mumford, 80 Ill. 192; Clingman v. Hopkie, 78 Ill. 152.

A party can not have an injunction to prevent a threatened trespass unless the court can see that irreparable injury is likely to result: Barm v. Bragg, 70 Ill. 283; J. & C. R. R. Co. v. Healy, 94 Ill. 416; Dunning v. Aurora, 40 Ill. 481; Lake View v. Letz, 44 Ill. 81; Daniel v. Green, 42 Ill. 472; Green v. Spring, 43 Ill. 280.

LACEY, J. This was a bill in equity commenced in the Kane county Circuit Court, by the appellant against the appellees, praying for an injunction to restrain the latter from draining certain ponds situated on the lands of appellee Peck.

Appellant is the owner of the N. E. ¼ of the S. W. ¼ of Sec. 7, T. 39 N., R. 8, E. 3d P. M. in the county of Kane. Appellee Peck owns the southeast quarter and also the south part of the northeast quarter of said section.

The north half of the southeast quarter of said section adjoins the east side of appellant's land.

Appellee Peck also owns the northwest quarter of section No. 8. Appellee Booth owns the west half of the southwest quarter of section No. 8. Mill creek runs through the west side of appellant's land north and south, not far from the west line.

From the east line of appellant's land at a point a little north of the center, north and south to the surface of the water in Mill creek, there is a descent of between ten and eleven

feet.  From the most distant pond, the draining of which is complained of, from appellant's east line, following the general course of the water in a wet time, there is a fall westward of between twenty-nine and thirty feet, a distance of some over half a mile.

The ponds in question are situated in the southwest corner of the northwest quarter of section No. 8.   The ditch, the digging of which was temporarily enjoined by the court below, was designed to run from the northernmost and largest pond in a southwesterly direction, cutting off a small corner of the southwest quarter of section 8, of the land belonging to Booth, and terminating at the public highway, running north and south between said last named tract and the southeast quarter of section 7.

This proposed drain intersects the nor𝕄 pond and two other ponds in said southwest corner of the northwest quarter of section No. 8, lying south of the first pond and draining the three ponds down to the public road.  From that point the water makes westwardly across the land of Peck, a half a mile, to the east line of appellant's land and is discharged on his land and thence making its way across to Mill creek.   From the point at the first pond, following the flow of the water to appellant's east line, the grade in the distance of two hundred rods, more or less, is nearly uniform.

Many years ago, by virtue of an agreement between the then owners of the appellant's and appellee Peck's respective lands in question, a small ditch was dug on the southeast quarter of section 7, in about the middle, running east and west, partly across said last named tract, which was intended to facilitate the draining westward to and across appellant's land to Mill creek.   In its natural state there was no marked and defined channel for the water across any of the land, but in a wet time the water simply flowed in a depression more or less wide, on the course indicated.

After the proposed ditch was partly dug, the water flowed across the appellant's land, spreading at times in its course to the width of fifteen or twenty rods.   The ditch complained of was partly dug prior to the time of the granting of the in-

junction and before any of the ditch was dug, appellant had put in a tile drain across his land, leading from his east line west to Mill creek, which in the then condition of the land was sufficient to drain it so that it was fit for pasture. After the work done by appellee Peck on the ditch complained of, the appellant's land was much wetter than before and at times unfit for pasture.

According to the evidence of different witnesses, the first of the ponds, when it was full, covered from about four to twelve acres of land and was from four and one half inches to sixteen inches in depth, and in very wet times would overflow and run west or southwest on about the line of the proposed new ditch and thence to appellant's land. The middle pond covered, when full, about nine tenths of an acre of land, and the south pond about one and three fourths acres.

Those ponds were the receptacle of drainage of from fifteen to twenty acres of land, more or less. The appellant's land was the servient estate to the lands lying east.

It is claimed by appellees that the digging of the proposed ditch, being only twenty-five or thirty rods in length, in such manner as to drain the ponds so that water would never remain in them, would not in the least injure appellant's land but would rather benefit it; that it would receive the water as fast as it fell, and would not prevent its accumulation and seepage on his land. It is also contended that there was a natural watercourse from the ponds in question to and over appellant's land to Mill creek; that he being the owner of the servient estate was bound to receive all the water that fell on appellee's land; that the latter had the right to drain their lands over that of the former in the places where it was accustomed to run even though the flow were increased and the servient estate damaged. The facts in the case are, as clearly shown by the evidence, that the ponds without the drainage proposed would hold a large body of water—that they often dried up entirely. When once dry a considerable rain-fall would be contained in them before they would overflow, and many rains would not cause any overflow at all, the ponds being sufficient to contain all the water that fell, and it would be evaporated by the sun.

As to the first proposition, we think the evidence amply shows that the opening of the proposed ditch would materially increase the flow of water.

It is claimed by the appellees' counsel that the water would reach appellant's land as well without as with the drain in dispute by means of seepage from the ponds. But we do not think, on account of the great distance of the ponds from the latter's land, any water would reach it from the ponds by that means, and if there did, it would be in such gradual quantities it would do no damage or would be carried off by the tile drain. In view of the evidence and circumstances, we are forced to conclude on account of the steep grade from the ponds to appellant's east line, in case the ditch was completed, that the rain-fall which formerly drained into the ponds would, almost as soon as discharged from the clouds, empty itself upon his land, greatly injuring and wetting a considerable portion of it and rendering it valueless for pasture or other purposes. If the water would not drain off appellee Peck's land in the manner supposed, we can conceive of no benefit the digging of the proposed ditch could be to him.

The object that he had in making this ditch was to drain the ponds and thereby reclaim the land that was at times covered with water, and was in consequence too wet for cultivation; nor is it claimed, as we understand, that there was any other object.

It becomes an important question here, and one difficult of solution in many cases, to determine to what extent the owner of the superior estate may drain his land over the servient or inferior estate.

Upon examination we find that the Supreme Court of this State are in full accord and harmony with the most of the courts of last resort of the several States, and with the civil and common law, and fully recognize the doctrine that parties thus situated in regard to their real property take and hold their several estates with reference to the question of drainage and flow of water the same as nature left them.

The owner of the superior has an easement attached to the inferior estate, giving him the right to have all the water that

naturally falls or flows on his land, carried off over and upon the land of the lower estate just as it did in a state of nature, whether by channel or otherwise.

Every one in this State derives his title to his land from the general government, and he is entitled to possess and enjoy it in the condition in which it was purchased, subject to all advantages and disadvantages imposed upon it by nature and natural laws, nor is he entitled to change such conditions, making them more favorable to himself to the injury of his neighbor. Neither party has a right in respect to water and drainage, to so use or improve or change his land from such a state as to materially injure the other.

The lower has no right to stop the natural flow of the water by dams, dikes or otherwise, so as to throw it back upon the land of the higher, and the latter has no right to change the flow of the water or increase it so as to materially damage the former.

But in the case of mere surface water the owner of the dominant estate may perhaps prevent it from flowing to the servient entirely and consume it for his own purposes. It is sometimes said that in the furtherance of good husbandry the water falling or flowing on the former may be cast on to the latter in increased quantities and if any damage occurs there is no remedy. Just what this exception means is not entirely clear; and the contention about the extent of this principle seems to be the main issue in this case.

The doctrines of the civil law on this subject have found favor in almost all the common law courts in this country and in England, and particularly in this State. `Gillman v. Madison Co. R. R. Co. 49 Ill. 484.

The rules of the civil law in regard to the rights under discussion are in substance the same as contained in the Code Napolean, and are set forth in the 640th article of that code as follows: as translated, "The owner of the lower ground is bound to receive from the higher ground the water which naturally flows down without the human hand contributing to its cause. The owner of the lower ground is not permitted to make a dike to prevent such flowing. The owner of the

higher ground can do nothing to aggravate the servitude or easement of the lower ground."

The Louisiana code is in substance the same. But the Code Napolean has an explanatory article which in controversies like the present directs the tribunals to decide in such a man-- ner as to reconcile the respect due to property with the inter- est of agriculture. See Cord. Jur. Civ. 39, Tit. 3. Secs. 2, 3, 4, 5. See translation of Sec. 3 and 4 of the Civil Code on page 171–21 Iowa Reports, in notes. "Sec. 3, Quintius Mucius, says that no action would lie if a man, for the purpose of cultivating the soil, does the same work with a plow by which water is brought into his neighbor. But Lubatius takes out only such cases where the work done with the plow was necessary for the purpose of raising crops, the action lying for works designed to improve the ground. Sec. 4, Mucius, says that ditches made to drain the ground, though performed for agricultural purposes, are not permitted to be made for the purpose of conducting the water into the adjacent premises, because a man must not improve his premises in such a way as to injure his neighbor."

In Martin v. Jett, 12 La. 501, 1838, in commenting on this doctrine and construing the Louisiana code, which is in substance as the above, and is the civil law, the judge says, "it is one thing to clear and cultivate arable land and another thing to reclaim lands naturally covered with stagnant water, in such a way as to throw the mass of water, which would naturally remain in pools or ponds, upon the lands of one's neighbors below." It is claimed by counsel that the drains attempted to be dug for the purpose of draining the ponds were being done in the proper and usual cultivation of the soil, and that the proof shows "that good husbandry requires the drainage of these sloughs," but appellees' counsel admit in their brief "that the drainage of creeks or lakes which hold long continued supplies of water is not necessary to the proper or usual use and cultivation of the soil."

We can not see any distinction between the two cases put. It is certainly necessary to drain the ponds off land to make it fit for cultivation, and it does not depend upon whether the

ponds are such as to hold long continued supplies of water, or whether there is just water enough in them in the planting, growing or harvesting season to render the ground covered unfit for cultivation. The object in either case is to reclaim the lands, and that only, and such work is in no sense done in furtherance of cultivating the soil with the plow.

An action as we have seen will lie for all damages caused by increase of the flow of water more than would naturally flow, except where the work done with the plow was necessary for the purpose of raising crops, and not designed to improve the land.

How, it may be asked, would it further the interests of agriculture to allow the owner of the dominant heritage to drain and reclaim his own land, and by doing so destroy as much of his neighbor's?

The cases of Livingston v. McDonald, 21 Iowa, 160; Kaufman v. Griesemer, 26 Penn. St. 407; Martin v. Riddle, 26 Penn. St. 415; Miller v. Loughback, 47 Penn. St. 154, all cited approvingly by our Supreme Court in case of Gillman v. Madison Co. R. R. Co. 49 Ill. 484, are in point, and all assert the doctrine here announced. Hicks v. Silliman, 93 Ill. 255, and Mellor v. Pilgrim, 7 Bradwell 306, are cases that announce the same doctrine. The case of Livingston v. McDonald, 21 Iowa, above quoted, is a well considered case, in which Judge Dillon, in a very able opinion, reviews most of the authorities applicable to the principles here involved.

In that case the defendant was the proprietor of the higher ground, the plaintiff of the lower; the water drained or flowed from the higher to the lower slough land. The work of the defendant complained of, was what was termed a whole or underground drain, about two hundred yards in length, constructed below the surface in the slough land of the defendant, terminating in an open drain, near the land of plaintiff, through which it discharged the water which in its course it had collected. The effect was to collect the water in a body and throw it on the plaintiff's land, that would not naturally run on in that way, and collected water from under the surface that never would have gone on it at all. The court below

instructed the jury that if the ditch increased the quantity
of the water on the plaintiff's land to his injury, or without
increasing it, threw it on the plaintiff's land in a different
manner from what the same would naturally have flowed, to
his injury, the defendant was liable for the damages occasioned
thereby, even if the ditch was constructed by the defendant,
in the course of the ordinary use and improvement of his
farm. This was held to be a good instruction by Judge Dil-
lon. In the case of Kaufman v. Griesemer, *supra*, the facts
were that from a point in plaintiff's field about 17 rods north
of the division fence, there was an ascent of several inches to
the fence, and in 22 feet from the fence south into Griese-
mer's land an elevation of ten inches more.

The water only, of floods and freshets, reached Griesemer's
land; a ditch was dug to compel a pond of water standing on
Kaufman's land to go onto Griesemer's land. Griesemer
built a sod dam to prevent it, and this was complained of.
The jury found for defendant on the issue that the dam only
prevented the excess of water going on his land over what
went there prior to the digging of the ditch. This was sus-
tained by the court. These cases are very similar to the case
at bar, and fully illustrate the principle that such cases are
not to be regarded as acts done in the furtherance of good
agriculture.

In the case before us, the three ponds much of the time
were filled with stagnant water, which laid there and perco-
lated into the soil or evaporated, and never reached appellant's
land; only in times of high water did they overflow, and the
surplus water drain to his land. Hence, this drain would in-
evitably cast a large amount of water upon appellant's land,
that, but for such drain, would not go there. That while the
appellee Peck would reclaim ten to fifteen acres of land, it
would be done at the expense of the loss of as much land to
appellant, or at least considerable damages would be inflicted
upon appellant by reason of such drain. In such case appel-
lee Peck would not be using his own land in such a manner
as not to damage appellant. The same principle applies to
appellee Booth, as a portion of his land is drained onto appel-
lant's in like manner.

The point made by appellee, that equity has no jurisdiction in this case, because as is claimed, appellant had a perfect remedy at law, we think is not well taken. The Supreme Court, as we think, has decided differently in the case of Hicks v. Silliman above quoted.

Again the question of jurisdiction of a court of equity of the subject-matter of this suit, is not set up and insisted on either by Peck or Booth in their respective answers. Without it being so raised, the point could not be raised in the court below or in this court.

For these reasons we think the court erred in dissolving the injunction and dismissing the bill.

The decree is therefore reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.